FILED
United States Court of Appeals
Tenth Circuit

August 17, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

JEFFREY MATTHEWS,

Petitioner - Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

Respondent - Appellee.

No. 07-6209
(D. Ct. No. CV-03-417-R)

**ORDER**

Before **BRISCOE, GORSUCH** and **HOLMES**, Circuit Judges.

This matter is before the court on appellant's Petition For Rehearing and Request for En Banc Consideration. That portion of the petition seeking panel rehearing is denied by the original panel members. We have determined, however, that *sua sponte* amendment of our original opinion is in order. Therefore, attached is an amended decision. The Clerk is directed to reissue the decision as amended nunc pro tunc to July 7, 2009.

The request for en banc consideration was circulated to all the judges of the court who are in regular active service. No judge called for a poll. Consequently, the suggestion for en banc review is likewise denied.

Appellant's Motion for Leave to Reply to Appellee's Response to Petition for

Rehearing and Request for En Banc Consideration is also denied.


Entered for the Court,


ELISABETH A. SHUMAKER
Clerk of Court

FILED
United States Court of Appeals
Tenth Circuit

**July 7, 2009**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JEFFREY MATTHEWS,

      Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

No. 07-6209

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CV-03-417-R)**

Timothy R. Payne, Assistant Federal Public Defender, Oklahoma City, Oklahoma (James A. Drummond, Assistant Federal Public Defender, and Robert S. Jackson, Legal Research and Writing Specialist, with him on the briefs), for Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General, State of Oklahoma, Oklahoma City, Oklahoma (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), for Respondent-Appellee.

Before **BRISCOE, GORSUCH,** and **HOLMES**, Circuit Judges.

**GORSUCH**, Circuit Judge.

In 1999, an Oklahoma state jury convicted Jeffrey Matthews of murdering his great-uncle and sentenced him to death. Since then, Mr. Matthews has challenged his conviction and sentence on direct appeal, in collateral proceedings in state court, and in a habeas petition in federal district court. All of these challenges have proven unsuccessful. Now before us, Mr. Matthews appeals the district court's denial of a writ of habeas corpus. He argues that reversal is warranted because of, among other things, juror misconduct, the lack of sufficient evidence to sustain his conviction, prosecutorial misconduct, and the ineffective assistance he received from his counsel. After careful review, we affirm.

I

On January 27, 1994, at around six o'clock in the morning, Minnie Short was awakened by a noise in her home in McClain County, Oklahoma. As she walked from her bedroom into the living room to investigate, an intruder wielding a knife attacked. The intruder cut Mrs. Short's throat, but still she remained conscious. When Mrs. Short's husband, Earl, followed her into the living room a few moments later, another intruder shot him in the head. Mr. Short died within minutes. The attackers then ordered Mrs. Short to lie still. They asked her where she hid her money. The two men kept Mrs. Short prisoner in her home while they searched it for nearly two hours, eventually leaving in the Shorts' truck with $500 cash and a .32 caliber Smith and Wesson taken from the house.

After the intruders left, Mrs. Short walked down a nearby road to seek help. A passing ambulance came to her aid, and police were notified of the attack. In response to

police questioning, Mrs. Short recalled that the man who stabbed her wore a dark jacket and that the man who shot Mr. Short wore tan, loose-fitting clothes. Mrs. Short also told police that the man who stabbed her made a telephone call from the kitchen just prior to leaving. Police traced this phone call and determined it was made at 8:16 a.m. to a Bill Guinn in Oklahoma City.

Police promptly contacted Mr. Guinn, who told them he received a call at that time from his nephew and employee, Tracy Dyer. Mr. Dyer had called to say that he would be late to work that morning because of car problems. Police then located Mr. Dyer and took him to the sheriff's office for questioning. There Mr. Dyer admitted that he and Jeffrey Matthews, a great-nephew of Earl and Minnie Short, went to the house to look for money they thought was hidden there. Mr. Dyer blamed Mr. Matthews for the attacks on the Shorts.

Police arrested Mr. Dyer and secured an arrest warrant for Mr. Matthews. They also executed a search of Mr. Matthews's home, where they seized a pair of brown coveralls, three $100 bills found in the freezer, and a prescription pill bottle for Xanax issued to Minnie Short. Officers also searched the backyard, but found nothing. Five months later, however, in June of 1994, one of Mr. Matthews's neighbors found a .32 caliber Smith and Wesson revolver buried in a field directly behind Mr. Matthews's house. The gun was later identified as the gun taken from the Shorts' home by their attackers. The police then returned to the same field with metal detectors and found

another buried gun, a .45 caliber Ruger pistol, that tests proved was used to kill Earl Short.

In due course, Mr. Matthews was charged with first degree murder and various other crimes. At trial, Mr. Dyer testified against Mr. Matthews, implicating him as Mr. Dyer's accomplice in the crime. At the close of evidence, the jury found Mr. Matthews guilty and sentenced him to death. On appeal, the Oklahoma Court of Criminal Appeals ("OCCA") reversed the conviction and ordered a new trial. It held that the trial court erroneously admitted statements by Mr. Matthews that were the product of an illegal arrest. *See Matthews v. State*, 953 P.2d 336 (Okla. Crim. App. 1998).

Mr. Matthews was then re-tried. At the second trial, the State again called Mr. Dyer to the stand. But this time he told a different story. Instead of implicating Mr. Matthews in the shooting, as he had in the first trial, this time Mr. Dyer testified that Mr. Matthews was not even involved in the break-in. When confronted by the government with his conflicting testimony from the first trial, Mr. Dyer said he had lied because prison guards and prosecutors threatened to harm him if he did not cooperate. Despite Mr. Dyer's about-face, the jury found Mr. Matthews guilty of all charges against him. With respect to the first degree murder charge, the jury also found the existence of two aggravating circumstances: (1) Mr. Matthews's action caused a great risk of death to more than one person, and (2) he committed the offense while under custodial supervision. Based on those aggravating circumstances, the jury sentenced Mr. Matthews to death.

- 4 -

Mr. Matthews once again appealed his conviction, but this time the OCCA affirmed. *See Matthews v. State*, 45 P.3d 907 (Okla Crim. App. 2000). After an unsuccessful petition for *certiorari* to the United States Supreme Court, Mr. Matthews filed an application for post-conviction relief in the Oklahoma state courts. The OCCA denied relief. Mr. Matthews then filed his § 2254 petition for a writ of habeas corpus in federal district court. That petition too was denied, and Mr. Matthews now appeals to this court.

Our review of this case is for the most part governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that, when a state court has "adjudicated a claim on the merits," we may grant relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "An adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather than procedural grounds." *Boyle v. McKune*, 544 F.3d 1132, 1137 (10th Cir. 2008) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 946-47 (5th Cir. 2001)). In what follows, we group Mr. Matthews's various arguments into five general categories for purposes of our analysis – arguments about jury misconduct (Part II), sufficiency of the evidence (Part III), prosecutorial misconduct (Part IV), ineffective assistance of counsel (Part V), and certain other remaining matters (Part VI).

II

We begin with two distinct but related allegations of jury misconduct. First, Mr. Matthews argues that he is entitled to relief because Juror #2 was exposed to outside influences that made her more likely to vote for a sentence of death. Second, he claims that he is entitled to relief because Juror #8 made up her mind in favor of the death penalty before the trial's penalty stage. Both claims arise out of the same turn of events.

After jurors found Mr. Matthews guilty in the early morning hours of Saturday, April 10, 1999, the court released them for the weekend with the usual admonition not to discuss the case with anyone. The penalty phase of the trial was set to begin the following Monday. Despite the court's instruction, later on Saturday, April 10, Juror #2 called a discharged alternate juror, James DeHaven. Before being dismissed from jury service, Mr. DeHaven had given Juror #2 a slip of paper with his phone number on it and asked her to call him to tell him the verdict. During their approximately 15 minute phone conversation, Juror #2 told Mr. DeHaven that the jury had found Mr. Matthews guilty and indicated how long the jury deliberated. Mr. DeHaven replied that he thought the jury had done the right thing. Mr. DeHaven added that he had read newspaper articles that supported the jury's verdict, and assured Juror #2 that she would understand what he meant once she was free to read the articles. Mr. DeHaven did not share any of the specific information in the articles with Juror #2. *Matthews*, 45 P.3d at 912.

After the jury reconvened and sentenced Mr. Matthews to death, Mr. Matthews made a motion for a new trial in light of Juror #2's contact with Mr. DeHaven. The trial

court held an evidentiary hearing to determine whether the conversation prejudiced the defendant. Two other jurors (Juror #7 and Juror #8) reported that Juror #2 had told them she had spoken with Mr. DeHaven, but neither remembered Juror #2 saying anything about the newspaper article defending the jury's guilty verdict. Juror #8 offered that the conversation did not affect her decision to vote for the death penalty because she had made up her mind to impose the death penalty before the penalty stage. The State objected to this response, arguing that it was outside the scope of the hearing as well as impermissible testimony about the juror's mental processes. The court sustained the State's objection and eventually denied the motion for a new trial.

On direct appeal, the OCCA affirmed. The OCCA held that Mr. Matthews could not prove that Juror #2's conversation with Mr. DeHaven was prejudicial to him – that is, that the call made her more willing to vote for a death sentence. *Matthews*, 45 P.3d at 913. The OCCA also ruled that Juror #8's testimony – that she had already made up her mind prior to the penalty stage – was properly excluded by the trial court under Okla. Stat. tit. 12 § 2606(B), which prohibits jurors from testifying "as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict." *Matthews*, 45 P.3d at 914-15. The district court declined to disturb these rulings in response to Mr. Matthews's § 2254 petition. Neither may we.

Juror #2 undoubtedly engaged in misconduct implicating the defendant's constitutional due process right to a fair trial. A jury's verdict "must be based upon the evidence developed at trial," *Irving v. Dowd*, 366 U.S. 717, 722 (1961), not on extraneous

information presented outside "a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," *Turner v. Louisiana*, 379 U.S. 466, 473 (1965); *see also Vigil v. Zavaras*, 298 F.3d 935, 940 (10th Cir. 2002). Still, if Juror #2's conversation about the case with the discharged former alternate juror violated this basic rule, the violation could have affected only her vote at the penalty phase, coming as the conversation did only after the guilt phase's completion. Ultimately, both the trial court and the OCCA concluded that Juror #2's misbehavior was harmless, even with respect to the penalty phase proceedings, because Mr. Matthews "failed to prove he was actually prejudiced from this inappropriate conversation." *Matthews*, 45 P.3d at 913.

The parties disagree about what standard we should apply when reviewing this determination. Mr. Matthews would have us ask "whether there exists a reasonable possibility that the external influence of information affected the verdict," *United States v. Simpson*, 950 F.2d 1519, 1522 (10th Cir. 1991), a standard we have applied on direct appeal when reviewing the district court's refusal to grant a new trial based on allegations the jury was prejudiced by extraneous material. The government, by contrast, believes that, because this case comes to us on collateral review, we should apply *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and so ask whether Juror #2's improper communication had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007) (*Brecht* governs harmlessness

- 8 -

determinations in habeas corpus proceedings).  Under this standard, we may reverse if we have "grave doubt" about the harmlessness of an error; in turn, "grave doubt" exists only where the case appears "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Precedent confirms that the government is correct.  "Interests of comity and federalism, as well as 'the State's interest in the finality of convictions that have survived direct review within the state court system,' mandate a more deferential standard of review in evaluating [Mr. Matthews's] claim." *Crease v. McKune*, 189 F.3d 1188, 1193 (10th Cir. 1999) (quoting *Brecht*, 507 U.S. at 635).  Therefore, following *Brecht*, on collateral review we ask only whether the extraneous material to which the jury was exposed had a "substantial and injurious effect" on the verdict.  *Fry*, 127 S.Ct. at 2328; *see also Malicoat v. Mullin*, 426 F.3d 1241, 1250 (10th Cir. 2005).  When conducting this inquiry, we must also bear in mind the Supreme Court's admonition that "[t]he substance of . . . *ex parte* communications and their effect on juror impartiality are questions of historical fact" on which the state trial court's findings are entitled to deference.  *Rushen v. Spain*, 464 U.S. 114, 120 (1983).

On the record before us, we cannot conclude that Juror #2's conversation with Mr. DeHaven, however inappropriate, substantially influenced the jury's sentence of death. This is not a case in which the question of harm or harmlessness is evenly balanced.  Mr. Matthews argues that the information Mr. DeHaven communicated to Juror #2 could have

affected the verdict in the penalty stage by removing any residual doubt Juror #2 harbored about Mr. Matthews's guilt, and thereby making her more likely to approve a death sentence. The difficulty with this suggestion is that the defense itself made no appeal to residual doubt in the penalty phase; in fact, defense counsel expressly disclaimed any such argument and emphasized that the defense respected the jury's verdict on the question of guilt. As well, it appears from the record that no specific details of the newspaper article were communicated to Juror #2; that no other juror was even exposed to Mr. DeHaven's comment that the newspaper article supported the guilty verdict; and that the jury did not discuss or consider the extraneous information. We, thus, have no record evidence that would permit us to infer harm flowing from Juror #2's conversation, and we reach this conclusion even without resort to the fact that Juror #2 testified at the State evidentiary hearing that her conversation with Mr. DeHaven had no effect on her penalty phase verdict.

This leaves us with and leads us to Mr. Matthews's argument that he is entitled to habeas relief because Juror #8 decided to impose the death penalty before listening to the penalty stage evidence. On direct appeal, the OCCA held that the trial court properly denied relief on this claim because the only evidence that Juror #8 made up her mind prior to the penalty stage was inadmissible under Okla. Stat. tit. 12 § 2606(B); no other competent evidence existed to support Mr. Matthews's position. The OCCA's decision qualifies for AEDPA deference as an "adjudication on the merits" of Mr. Matthews's federal due process claim because it was not a "procedural ruling in which the court

dismissed [the] claim as improperly before [it].  Rather, the state court's decision was a substantive determination that [the] claim was unsupported by any evidence," competent under that state's rules of evidence.  *Salazar v. Dretke*, 419 F.3d 384, 398 (5th Cir. 2005).

We cannot say that the OCCA's decision amounts to reversible error under AEDPA's deferential standard.  The only possible evidence supporting Mr. Matthews's position was excluded by the Oklahoma trial court under its analogue to Federal Rule of Evidence 606(b).  There is nothing in clearly established Supreme Court law requiring states to take cognizance of evidence excludable under such common evidentiary rules.  Just the opposite.  In *Tanner v. United States*, 483 U.S. 107, 113-16 (1987), the defendant argued that post-verdict juror testimony concerning the ingestion of drugs or alcohol during trial was not excluded by Federal Rule of Evidence 606(b), and, that even if the evidence was barred by Rule 606(b), "an evidentiary hearing including juror testimony on drug and alcohol use [was] compelled by [the] Sixth Amendment right to trial by a competent jury."  *Id.* at 116-17.  The Supreme Court rejected both arguments, explaining that the testimony of juror alcohol and drug use was barred by Rule 606(b) and that, in light of numerous other protections designed to secure an impartial and competent jury – such as *voir dire*, observation of the jury during court, reports by jurors of inappropriate behavior *before* rendering a verdict, and post-verdict impeachment by evidence other than

- 11 -

juror testimony – the Constitution does not require a post-verdict hearing in which such

evidence is admissible.  *Id.* at 126-27.[1]

## III

Next, Mr. Matthews contends there is insufficient evidence to support his

conviction.  Under Supreme Court precedent, sufficient evidence exists to support a

conviction if, "after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Because the OCCA

applied the *Jackson* standard in deciding Mr. Matthews's sufficiency claim on direct

review,[2] our task is limited by AEDPA to inquiring whether the OCCA's application of

---

[1]  Mr. Matthews seeks to secure a different result by citing *McDonald v. Pless*, in which the Supreme Court suggested that "it would not be safe to lay down any inflexible rule" barring post-verdict juror testimony because there "might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice."  238 U.S. 264, 268-69 (1915) (internal quotation marks omitted).  But even if one might plausibly contend that this language leaves open the possibility that the rule barring post-verdict juror testimony would violate the Sixth Amendment in some rare case, as Mr. Matthews supposes, it does not specify when such a case would arise and thus can hardly suffice as the sort of clearly established law recognizing a constitutional right to the introduction of juror testimony impeaching a verdict that AEDPA requires.

[2]  Though the OCCA did not cite *Jackson*, it ultimately concluded that "this evidence was sufficient for a rational trier of fact to conclude that Matthews [was guilty]," *Matthews*, 45 P.3d at 920, a formulation identical to *Jackson*'s.  That the OCCA did not cite *Jackson* is of no moment; state courts need not refer to, or even be aware of, controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Harris v. Poppell*, 411 F.3d 1189, 1195-96 (10th Cir. 2005).

*Jackson* was unreasonable. *See Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008).[3]

Mr. Matthews offers several facts that, he thinks, demonstrate the absence of sufficient evidence to support his conviction even under these deferential standards: (1) Tracy Dyer's testimony that Mr. Matthews was not involved in the break-in and murder; (2) inconsistencies surrounding the discovery of the murder weapon; (3) alibi testimony from Mike Slay that Mr. Matthews was not at the Shorts' residence at the time of the crimes; (4) inconsistencies in Mrs. Short's testimony; and (5) the lack of blood, DNA, and fingerprint evidence as well as no eyewitness testimony placing Mr. Matthews at the Short residence at the time of the murder. We consider each of these arguments by turn.

First, it is surely true Tracy Dyer testified in the second trial that Mr. Matthews was not involved in the break-in or murder. But this fact standing alone hardly renders the evidence in this case insufficient for the jury to find Mr. Matthews guilty. Abundant other evidence linked Mr. Matthews to the crime. And the jury was not only free to discredit Mr. Dyer's testimony, it had ample reason to do so: after all, Mr. Dyer himself admitted that he gave a completely different account of Mr. Matthews's involvement at

---

[3] Mr. Matthews would have us ask a different question; he argues that we should review the OCCA's application of the Oklahoma sufficiency-of-the-evidence standard, which, he submits, requires the proof adduced at trial "to exclude every reasonable hypothesis except that of guilt." Appellant's Br. at 77. But as a federal court performing collateral review, it is not our role to ensure that the Oklahoma state court correctly applied its own law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Our role is to enforce federal law, and *Jackson* makes clear that the due process guarantee of the federal Constitution imposes a very different standard than the one he proposes.

the first trial. Plainly, Mr. Dyer was telling the truth at one trial and lying at the other, and the jury was free to determine which was which. As an appellate court on collateral review, we are not allowed to "weigh conflicting evidence or consider the credibility of witnesses." *Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir. 2004). Rather, when "faced with a record of historical facts that supports conflicting inferences [the court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution." *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). Applying that standard here, we must presume that the jurors simply did not credit Mr. Dyer's testimony at Mr. Matthews's second trial.

Second, Mr. Matthews argues the two guns discovered behind his house (the .45 caliber pistol used in the murder along with the .32 caliber revolver stolen from the Shorts) were planted, and that this fact establishes reasonable doubt. At trial, the State introduced evidence that Mr. Matthews's neighbor, Ted Mize, discovered the guns nearly six months after Mr. Matthews was taken into custody. Mr. Mize was doing yard work in the area behind Mr. Matthews's home one evening when he noticed a hole in the yard and eventually uncovered the .32 caliber revolver stolen from the Shorts' home. Mr. Mize called law enforcement, who discovered the murder weapon buried in the same general location. Little of this evidence, of course, helps Mr. Matthews's cause.

Mr. Matthews stresses, however, the portion of Mr. Mize's testimony in which he states that he had not previously noticed the hole in which he discovered the revolver, even though he had been in the same area a few days prior. Mr. Matthews places great

reliance, as well, on the testimony of McClain County Undersheriff Ronnie Brown that the ground in the area where the murder weapon was discovered looked like it had been "disturbed recently." 1999 Tr. 1, Vol. VII at 1612, 1618. This testimony, Mr. Matthews claims, establishes that the guns were planted a few days prior to their discovery by Mr. Mize and long after Mr. Matthews was taken into custody. But the fact that Mr. Mize had not *noticed* the hole a few days before hardly compelled the jury to conclude that the hole was only dug and the guns buried in the last few days. Mr. Brown's testimony that the ground looked as if it had been "disturbed recently" is likewise ambiguous as to whether the ground was disturbed in the preceding several days, weeks, or months. Neither does it suggest that the ground was disturbed by some unknown hole digger rather than by Mr. Mize's yardwork or some other innocent and unrelated cause. Accordingly, the evidence creates "a record of historical facts that supports conflicting inferences," a situation in which we must presume "that the trier of fact resolved any such conflicts in favor of the prosecution." *Messer*, 74 F.3d at 1013.

Third, Mr. Matthews points to testimony given by Mike Slay, arguing that it establishes he had an alibi precluding any rational trier of fact from finding him guilty. Whatever other problems might exist with this argument, one difficulty it surely faces is that Mike Slay did not testify at the trial under review; he only testified at Mr. Matthews's first trial. The question before the OCCA and us under *Jackson* concerns the sufficiency of the evidence at the trial that resulted in the defendant's conviction, not the availability of other evidence that wasn't used as the basis to deprive Mr. Matthews of his liberty.

- 15 -

Our review is thus "limited to 'record evidence' . . . [and] does not extend to nonrecord evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993); *accord Romano v. Gibson*, 239 F.3d 1156, 1164 (10th Cir. 2001). Put differently, it makes no sense for us, in reviewing whether a jury's verdict was based on sufficient evidence, to consider facts the jury never heard.

Fourth, Mr. Matthews's argument that the OCCA unreasonably applied *Jackson* by failing to take note of inconsistencies in Mrs. Short's testimony fails for the same reason. Mr. Matthews points to purported inconsistences between Mrs. Short's testimony at the first trial and her testimony at the second trial. But in a sufficiency challenge, the pertinent question is whether the evidence introduced at the trial resulting in the defendant's conviction is sufficient to allow a rational trier of fact to convict. Of course, defense counsel was free to attempt to impeach Mrs. Short at the second trial by pointing to inconsistencies between her testimony then and at the first trial. And, the jury was free to disbelieve Mrs. Short on account of those putative inconsistencies. But all that proves is that a rational juror *might not* accept Mrs. Short's testimony at the second trial; it doesn't show that a rational juror *could not* accept it, which is the question on which a sufficiency challenge necessarily must focus.

Finally, Mr. Matthews claims that the OCCA's application of *Jackson* was unreasonable because the prosecution did not introduce blood, DNA, or fingerprint evidence, or eyewitness testimony. But *Jackson* does not require such evidence to sustain a criminal conviction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e

- 16 -

have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."). And, again, the focus of a *Jackson* inquiry is not on what evidence is missing from the record, but whether the evidence in the record, viewed in the light most favorable to the prosecution, is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

With that standard in mind, we are convinced the OCCA's application of it was not unreasonable. While Tracy Dyer testified that Mr. Matthews was not involved in the crimes, the jury also learned that Mr. Dyer had implicated Mr. Matthews as his accomplice in an earlier proceeding. And, as the OCCA noted, significant and uncontested other evidence pointed in the same direction, including: (1) Mr. Matthews's girlfriend's testimony that Mr. Matthews left his home with Mr. Dyer the night before the murder and did not return that night; (2) Mark Sutton's testimony that he loaned Mr. Matthews his .45 caliber Ruger the day before the murder and that Mr. Matthews did not return it; (3) the same .45 caliber Ruger was later identified as the murder weapon and was discovered behind Mr. Matthews's home; (4) Bryan Curry's testimony that a year prior to the murder, he drove Mr. Dyer and Mr. Matthews to the Shorts' residence to burglarize their cellar; (5) Thomas Tucker's testimony that he saw two people in pickup trucks near the Shorts' residence around the time of the murder, one of whom was wearing khaki coveralls; (6) Mrs. Short's testimony that the shooter was wearing khaki coveralls; and (7) the fact that police seized Mrs. Short's pill bottle, $300.00 cash, and a

pair of brown coveralls from Mr. Matthews's home two days after the murder. *Matthews*, 45 P.3d at 920. Mr. Matthews does not attempt to discredit any of this evidence, all of which suggests that it was he who shot and killed Earl Short. On this record, we cannot say that the OCCA's sufficiency of the evidence analysis falls afoul of AEDPA's standards of review.

IV

Mr. Matthews raises five claims of prosecutorial misconduct stemming from the State's closing argument. A prosecutor's remarks to the jury can create constitutional error in one of two ways. First, prosecutorial misconduct can prejudice "a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Patton v. Mullin*, 425 F.3d 788, 811 (10th Cir. 2005). In such a case, we review the harmfulness of the error using *Brecht*'s "substantial and injurious effect" standard." *See Fry*, 127 S. Ct. at 2328. Second, even if the prosecutor's improper remarks do not impact a specific constitutional right, they may still create reversible error if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. The Supreme Court has instructed us that "the appropriate standard for review of such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly*, 416 U.S. at 642); *Patton*, 425 F.3d at 811. That is, our interest is in whether Mr. Matthews got a fair trial; "inappropriate prosecutorial comments,

standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985). The OCCA concluded that none of the challenged remarks was improper, and that in any event none prejudiced Mr. Matthews. We assess this decision through AEDPA's forgiving lens,[4] and in doing so we cannot say that the OCCA's analysis was contrary to or an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts.

First, Mr. Matthews objects to the prosecutor's reference, in closing argument, to a photograph showing a picture of a shovel leaning against the back of Mr. Matthews's house. This reference was misleading, Mr. Matthews argues, because the photograph suggested to the jury that Mr. Matthews used the shovel to bury the murder weapon when, in fact, McClain County Sheriff Otis Anderson used the shovel while executing the search warrant. As it happens, however, Sheriff Anderson testified at trial not only that he used the shovel when executing the search warrant; he also testified that when he first arrived at the scene he discovered the shovel *exactly as it appeared in the picture* – leaning against Mr. Matthews's house. There could be nothing misleading about the

---

[4] The government contends that most of these claims were procedurally defaulted because (with one exception) Mr. Matthews did not object to the prosecutor's statements at trial. While exercising plain error review, the OCCA held that none of the challenged comments was in fact "error" at all. In this circumstance, we do not apply the procedural default rules. We have held that when a state court "den[ies] relief for a federal claim on plain-error review because it finds the claim lacks merit under federal law," that decision is a merits determination entitled to ordinary AEDPA deference. *Douglas v. Workman*, 560 F.3d 1156, 1177-78 (10th Cir. 2009) (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1205-06 (10th Cir. 2003)).

- 19 -

picture's use, then, and nothing improper about the prosecution's reference to it in closing.

Second, Mr. Matthews argues that the prosecutor impermissibly vouched for the integrity of the State's witnesses when he argued to the jury: "You still have the fact that within 48 hours of Mr. Short's death, the OSBI, the Oklahoma State Board of Investigation had his killers in custody. That's what the evidence says, and that's a pretty good job." 1999 Tr. 2, Vol. II at 221. Mr. Matthews rightly notes that the Supreme Court has held that a prosecutor's vouching for the credibility of witnesses poses the danger that "evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant," as well as the risk that the jury will "trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19. But the prosecutor here did not reference any extra-record evidence in his argument; instead, quite the opposite, he sought to direct the jury to evidence in the record showing that Mr. Matthews and Mr. Dyer were in custody within 48 hours of Mr. Short's murder. To be sure, the prosecutor went on to comment that "that's a pretty good job." Even assuming without deciding that this remark was an effort to have the jury trust the State's view of the evidence rather than reach its own conclusion that the evidence suggested competent police work, Mr. Matthews offers us no basis for concluding that the OCCA was not just wrong, but unreasonably wrong under AEDPA, in holding that this comment did not render the whole trial fundamentally unfair. Neither would it be easy for him to do so: the weight of the evidence amassed against Mr. Matthews was strong, a fact which, the

Supreme Court has instructed, "reduce[s] the likelihood that the jury's decision was influenced by argument." *Darden*, 477 U.S. at 182.

Third, Mr. Matthews argues that the prosecutor referred to facts not in evidence when he said in closing "I don't know how much more blatant [the defense] can get. All they want you to do is speculate this thing into oblivion. And you know what? That's the only way Jeffrey David Matthews is going to walk out of here a free man is if you ignore the evidence and just speculate about this. And that's what's got them scared to death, because they know it too." 1999 Tr. 2, Vol. II at 224. The first half of this statement, however, is merely an admonition against speculation, and there can be no question that all parties are free to ask the jury to stick to the facts and avoid speculating. In the last part of this statement, the prosecutor added that Mr. Matthews and his attorneys were "scared to death" the jury would avoid such speculation. This comment was unnecessary and itself surely involved an element of speculation. But, like the "that's a pretty good job" remark discussed earlier, the OCCA concluded it did not render Mr. Matthews's trial fundamentally unfair, and we cannot say, as we must under AEDPA, that its determination was unreasonable. Mr. Matthews himself cites no authority suggesting otherwise.

Fourth, Mr. Matthews argues that the prosecutor commented on his decision to exercise his Fifth Amendment right not to testify when he said:

> Despite the fact that the defense has chosen to put on no testimony, no witnesses, they certainly will still make an argument. You can count on it. You can bank on it. [Mr. Matthews's attorneys] will argue before you

vigorously in defense of Mr. Matthews. And the defense – the only defense that is really available under the evidence you have heard is, I wasn't there. I wasn't there. But if they're going to build that defense, they're going to have to build it on the evidence.

*Id.* at 110-111. Mr. Matthews also objects to another portion of the closing argument in which the prosecutor made clear that the defense was under no burden to present witnesses in order to prevail and added that "having done so, that means that the State's evidence, other than [the defense's] questions on cross-examination, stands essentially uncontroverted." *Id.* at 116. And, again, Mr. Matthews alleges the prosecutor referred to his decision not to testify when he said the following: "[I]f Mr. Matthews is sitting there, thinking he's innocent, based on the evidence you have heard he's deluding himself." *Id.* at 226.[5]

While it is of course well settled that a prosecutor may not comment on the defendant's exercise of his or her Fifth Amendment liberty, *Griffin v. California*, 380 U.S. 609, 615 (1965), it is equally well settled that a prosecutor "is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony." *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999). Whatever conclusion we would reach about these comments writing on a clean slate, the OCCA concluded that they were (properly) directed at Mr. Matthews's failure to present evidence rather than (improperly)

---

[5] On appeal, Mr. Matthews raises additional statements by the prosecution that he contends constituted an impermissible comment on his failure to testify. Mr. Matthews did not raise these statements before the district court, however, and thus did not preserve them for appellate review. *Cummings v. Norton*, 393 F.3d 1186, 1190-91 (10th Cir. 2005).

directed at Mr. Matthews's exercise of his Fifth Amendment rights. To reverse, we must conclude that the OCCA's decision on this score "was not merely wrong but unreasonable." *See Dockins v. Hines*, 374 F.3d 935, 940 (10th Cir. 2004). We cannot say that here. Our own cases teach that the dispositive legal inquiry is "whether the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) (alteration in original) (internal quotation marks omitted). Here, none of the prosecutor's remarks actually refers to Mr. Matthews's decision not to take the stand, and all expressly reference the absence of evidence supporting his position. The OCCA's conclusion that the record is insufficient to give rise to an inference that the prosecutor impermissibly commented on Mr. Matthews's right not to testify may not be unavoidable but neither does this record permit us to say it was unreasonable.[6]

Fifth, Mr. Matthews argues that the prosecution made a variety of other "inflammatory comments" during closing argument. He points, among other things, to this passage:

> Almost two weeks ago each of you advised the attorneys in this case and the Judge that you would not [speculate on the case, but] that you would judge the case on the evidence [we] have presented to you and not by guessing or speculating on what other possible evidence there may have been out there that

---

[6] We note that the prosecution should not have suggested, at the end of the first comment, that the defense was *required* to come forth with evidence to prove any defense. But this aspect of the prosecutor's comment is not before us. The defense objected to it at trial on this basis, and the trial court sustained the objection.

you don't have. Now, I will be interested, as I'm sure you will, during the defense's closing how many times [defense counsel] will come up here and use the words possible, possibly, could have, what if, might, maybe, or give you different scenarios. And I submit to you if you had your notebooks right now, and every time [defense counsel] did that, you marked down a little match stroke – one, two, three, four, five – by the end of their closing arguments you could have a bonfire. Wait and see.

1999 Tr. 2, Vol. II at 112-13. The OCCA concluded that this statement was a reasonable argument – an admonition against speculation – and that it did not so infect the trial with unfairness as to constitute a denial of due process. Again, Mr. Matthews refers us to no authority suggesting such a conclusion is an unreasonable application of clearly established Supreme Court precedent.

Finally, Mr. Matthews points us to still other passages in closing, including when the prosecutor said, "[Defense counsel] said that apparently he feels the State should be indicted for putting on [as witnesses] admitted liars in their case. Folks, I didn't choose them. They were [Mr. Matthews's] friends and associates." *Id.* at 213. Mr. Matthews claims that this statement denigrated his defense because his lawyer never said that the State should be indicted. While Mr. Matthews is surely correct that his lawyer never suggested that the State should be indicted, he fails to make mention of the fact that his counsel did say that the State's case "reek[ed] of liars, half-truth tellers, accidental liars," *id.* at 209; that "[t]he State of Oklahoma has gone to bed with this liar," *id.* at 200; and that the prosecution wanted the jury to render its verdict "based on liars and people that got deals and people that have motives to lie and protect themselves," *id.* at 209. The statement Mr. Matthews objects to plainly was a response to these criticisms, and the

- 24 -

Supreme Court has said that, when a prosecutor is responding to defense counsel's argument, courts "must also take into account defense counsel's opening salvo." *Young*, 470 U.S. at 12. To be sure, improper remarks are not excused just because they are provoked by opposing counsel, but the Supreme Court has told us that "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Young*, 470 U.S. at 13; *see also Darden*, 477 U.S. at 182 (The "invited response [doctrine] is used not to excuse improper comments, but to determine their effect on the trial as a whole."); *cf. Whittenburg v. Werner Enterprises, Inc.*, 561 F.3d 1122, 1130-31 (10th Cir. 2009) (noting this "tit-for-tat" phenomenon). In this case, the prosecutor's remark was certainly more restrained than defense counsel's provocation and, under these circumstances and governing Supreme Court precedent, we cannot say the OCCA was unreasonable to conclude that this remark did not unfairly prejudice Mr. Matthews.

V

Mr. Matthews next argues that his trial counsel made six errors that denied him the effective assistance of counsel guaranteed by the Sixth Amendment. To succeed on such a claim, Mr. Matthews must show that his counsel's performance was deficient and that his defense was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Performance is deficient if it falls "below an objective standard of reasonableness" measured "under prevailing professional norms" and considered in light of the circumstances. *Id.* at 688. At the same time, Mr. Matthews must overcome "a

- 25 -

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, Mr. Matthews must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In a death penalty case, the relevant prejudice inquiry is whether there is a reasonable probability that one juror would have chosen a sentence other than death. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

On direct appeal, the OCCA applied *Strickland* to Mr. Matthews's claims of ineffective assistance and rejected them. *Matthews*, 45 P.3d at 918-19. Ordinarily this would compel us to review Mr. Matthews's argument in light of AEDPA's deferential standards. In this case, however, Mr. Matthews sought an evidentiary hearing in state court under the terms of Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2002), to help prove his claims. *Matthews*, 45 P.3d at 919 n.16. This court, in an *en banc* proceeding, recently heard argument on whether and in what circumstances AEDPA deference or *de novo* review should apply when the OCCA has denied the defendant an evidentiary hearing under this rule. *See Wilson v. Sirmons*, 549 F.3d 1267 (10th Cir. 2008) (order setting *en banc* hearing). Given the uncertainty surrounding the standard of review in these circumstances, and because it makes no difference to the outcome of our analysis in this case, we believe the prudent course is to examine Mr. Matthews's claims *de novo*, the most favorable possible

standard of review.  *Accord Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (assuming without deciding that *de novo* review applies when claim still fails under that standard).

First, Mr. Matthews complains his counsel failed to cross-examine Mr. Dyer at the second trial.  After Mr. Dyer testified that Mr. Matthews was not involved in the crime, Mr. Matthews submits, the State's case was held together only by physical evidence tying Mr. Matthews to the murder – namely, the cash and Minnie Short's pill bottle found in Mr. Matthews's home and the murder weapon and gun taken from the Shorts' home discovered in his backyard.  Mr. Matthews suggests that, if defense counsel had asked Mr. Dyer on cross-examination why the cash, the pill bottle, and the guns were discovered in or near Mr. Matthews's home, Mr. Dyer could and would have provided explanations exonerating Mr. Matthews.

The record is clear, however, that defense counsel contemplated this course and didn't follow it for good reason.  Defense counsel asked the trial judge about the consequences of asking Mr. Dyer questions about the pill bottle and guns on cross examination:

> If we ask this witness specific questions about the crime, a very limited–not actually about the crime, but about a matter after the crime that he may have testified to differently at the trial, we want to know if the State then proceeds and says we've opened the door for him to read the whole transcript or not. Or will it be limited to–we're making our motion that it should be limited to the issues that were addressed on examination.  And I'm specifically talking about the two things, the pill bottle and the pistols.

1999 Tr. 1, Vol. VI at 1519. The State responded to all this by saying that, if the defense asked Mr. Dyer about the facts of the crime, it intended to ask follow up questions and that, if Mr. Dyer refused to testify, it would read his testimony from the first trial to the jury. When defense counsel argued that he should be allowed to ask questions about the pill bottle and pistols without the prosecution going into the details of Mr. Dyer's prior testimony, the trial court responded, "if you go into the details, he's going into the details. So it's just at your own risk." *Id.* at 1520. No one before us challenges the legitimacy of this ruling, and it was only after receiving it that Mr. Matthews's counsel decided there would not be any cross-examination of Mr. Dyer.

These circumstances indicate that Mr. Matthews's counsel made a considered (and eminently rational) decision not to cross-examine Mr. Dyer. There was, after all, every reason for Mr. Matthews's counsel to do whatever he could to prevent the State from delving into Mr. Dyer's prior testimony. While the State elicited from Mr. Dyer the bare fact that he had testified against Mr. Matthews in the first trial, it did not elicit or read into evidence the specifics of Mr. Dyer's prior testimony. The specifics of that testimony indicated, among other things, that Mr. Matthews took the lead in planning the burglary and murder and that he told Mr. Dyer what to do; shot Earl Short; took both the murder weapon and the gun stolen from the Shorts' with him; used a towel to wipe fingerprints off objects in the house and the getaway vehicle; and after splitting some of the Xanax pills with Mr. Dyer, took the bottle with him. Obviously, these details of Mr. Dyer's testimony from the first trial could have been extremely damaging to Mr. Matthews if

- 28 -

introduced at the second. They would have provided an explanation for all the physical evidence discovered in and around Mr. Matthews's home, and they would have painted Mr. Matthews as all the more responsible for Mr. Short's murder. We can hardly say that the strategic decision made by Mr. Matthews's counsel to keep this information from the jury was professionally deficient.

Second, Mr. Matthews argues his trial counsel was ineffective because counsel failed to call two witnesses who, Mr. Matthews contends, would have provided him with an alibi. Mr. Matthews argues that Mike and Grady Slay, both witnesses called by the State (not defense) at Mr. Matthews's first trial, could have testified that they saw Mr. Matthews at their trailer park around the time of the murder.

As it happens, however, Mike Slay's testimony is far more ambiguous than Mr. Matthews suggests. Under the State's theory of the case, Mr. Matthews was at the Short residence in the early morning on January 27 – until sometime between 8:15 and 9:00 a.m. At one point in his testimony at the first trial, Mike Slay estimated that he saw Mr. Matthews in the trailer park around 6:30 to 7:00 a.m., but at another point he testified that it could have been as late as 9:00 a.m., and at another point still he said it might have been later than 9:00 a.m. He finished his testimony by admitting that he did not actually know what time he saw Mr. Matthews. Mr. Matthews has not shown that it was unreasonable of his lawyer to decline to call such an uncertain witness (who, after all, wasn't likely to be uniformly helpful to the defendant, given that he testified for the State in the first trial). And, at all events, there is not a reasonable probability that this speculative and equivocal

testimony would have done anything to change the result of the trial; the evidence against Mr. Matthews was simply too strong. The same conclusion pertains to Grady Slay. Grady Slay testified at Mr. Matthews's first trial that he thought he saw Mr. Matthews on the morning of the murder around 10:15 to 10:30 a.m. dressed in only jeans and a t-shirt and walking quickly toward Mike Slay's trailer. But Grady Slay was not even sure it was Mr. Matthews, and even if it was Mr. Matthews he saw, it was well *after* the break-in and murder at the Shorts' residence. We cannot fault Mr. Matthews's lawyer for not calling this witness either, and again we fail to see any plausible argument for how his testimony could have made any difference.

Third, Mr. Matthews argues that his trial counsel should have called Lora Gulley as a witness to impeach the testimony of her husband, Robert Gulley, who testified for the State. Robert Gulley testified that he saw Mr. Matthews at a gas station around 10:00 a.m. on the morning of the murder. According to Mr. Gulley, Mr. Matthews filled up a car with gas and, when he went into the store to pay, he had a stack of twenty-dollar bills and was shaking so hard the cashier had to take the money out of his hands. Mr. Matthews tells us that Lora Gulley, if called, would have testified that Mr. Matthews's car was not working on the day of the murder. Even if this were true, however, it is neither here nor there. Robert Gulley didn't testify that Mr. Matthews was driving his own car, only that he was driving *a* car. Any testimony from Lora Gulley that Mr. Matthews's vehicle was broken, thus, would have done little to undermine Mr. Gulley's testimony.

We see no deficient performance or prejudice arising from counsel's tactical decision not to call Mrs. Gulley.

Fourth, Mr. Matthews argues that his counsel was ineffective for failing to call as witnesses several of Mr. Dyer's fellow inmates. These individuals were apparently prepared to testify that Mr. Dyer told them he lied at Mr. Matthews's first trial. As it happens, however, Mr. Dyer himself testified at the second trial that he told these fellow inmates about his lie. *Matthews*, 45 P.3d at 918. The inmates' testimony, thus, would have been cumulative of Mr. Dyer's own. Neither did the State ever challenge Mr. Dyer's testimony that he *told* fellow inmates he lied at the first trial. Rather, the State contested (only) the truth of the underlying assertion that he did lie at the first trial. We cannot fault defense counsel for failing to produce cumulative evidence tangential to the parties' actual dispute, nor say that its production was prejudicial to the outcome of this case.

Finally, Mr. Matthews complains that his trial counsel failed to introduce testimony from Mr. Matthews's grandmother that he made hobby crafts in prison, sold them, and asked that the proceeds be used to support his daughter.[7] Mr. Matthews argues

---

[7] The OCCA held this claim procedurally barred because Mr. Matthews first raised it in his motion for post-conviction relief when it could have been raised on direct appeal. *See* OCCA Opinion Denying Post-Conviction Application, *Matthews v. State*, No. PCD-2002-391 (unpublished) (Aug. 25, 2002), at 4-5. While the State argues that Mr. Matthews thus procedurally defaulted his claim in federal court by failing to comply with an independent and adequate state procedural rule, Mr. Matthews has asserted ineffective assistance of appellate counsel as the cause of his failure to raise this challenge. If he could prove such a failure by appellate counsel, he might have grounds to avoid the procedural bar. *See Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991).

that this evidence would have shown his "human side" and helped refute the prosecution's portrayal of him. But this evidence, too, would have been largely cumulative of evidence the jury did hear. The defense called three different mitigation witnesses – Mr. Matthews's mother, a psychologist who evaluated him, and Wendell Marley, a volunteer for the Jehovah's Witnesses who met regularly with Mr. Matthews. Collectively, these mitigation witnesses communicated to the jury that Mr. Matthews was interested in art, had strong family relationships, and was concerned with the welfare of others. For example, the psychologist testified that he had "incredible art ability," and that he produced art in prison, 1999 Tr. 2, Vol. III at 333; his mother testified that she and he shared a "very, very close" relationship, *id.* at 296; and the volunteer for the Jehovah's Witnesses testified that Mr. Matthews demonstrated a "genuine concern for other people," *id.* at 376. To the extent the evidence Mr. Matthews now proffers is cumulative of what the jury heard, we cannot say that counsel's decision not to offer it was either deficient or prejudicial.

Even so, in one respect the evidence Mr. Matthews now proffers arguably is not cumulative of the evidence actually presented during the penalty phase. At trial, the jury did not hear any evidence that Mr. Matthews sought to direct proceeds from his prison art sales to his daughter. Assuming without deciding that this particular fact has some independent mitigating value apart from the evidence that was shared with the jury, and that counsel was deficient for failing to introduce it, to reverse we must still find a

But we need not enter this thicket. Even assuming *de novo* review, the claim fails.

- 32 -

reasonable probability that it would have spared Mr. Matthews the death penalty – that, after "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence," there is a reasonable probability one juror would have voted for a different sentence. *Young v. Sirmons*, 551 F.3d 942, 966, 969 (10th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 534). We discern no such reasonable probability here. The jury found two aggravating circumstances – that Mr. Matthews's crime caused a great risk of death to more than one person, and that he committed the offense while under custodial supervision. Neither of these aggravating factors nor any of the record facts about Mr. Matthews's crime is in any way called into doubt by the proffered evidence. We likewise do not see how it is reasonably likely that jurors would have changed their view that aggravating evidence outweighed mitigating evidence based on this single additional fact. It may add something new, but it is something very little to the evidence the jury already heard about Mr. Matthews's close family connections, his concern for others while in prison, and his artwork. Indeed, we have found excluded evidence substantially more novel and powerful than this insufficient to suggest a reasonable probability of a different outcome in death penalty cases. *See, e.g., Young*, 551 F.3d at 968 (moral culpability not reduced by defendant's good deeds performed during ministry, the blow of losing both a brother and a son to sickle cell anemia, and responding to emotional distress by falling

into alcoholism). We see no way, remaining faithful to our precedent, to reach a different result here.[8]

VI

In addition to the previous claims of error, Mr. Matthews raises two others meriting discussion: (1) that his conviction depended on evidence that should have been suppressed under the Fourth Amendment, and (2) that the jury was not instructed that it must find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

Mr. Matthews first argues that probable cause did not exist for the magistrate to issue the search warrant for Mr. Matthews's home that led to the seizure of Mrs. Short's Xanax bottle, three $100 bills, and a pair of brown coveralls. He also contends that the search warrant application deliberately misled the magistrate by omitting certain material facts. For its part, the district court concluded it was barred from reaching the merits of this claim by *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that a state prisoner may not be granted federal habeas relief on the ground that evidence was obtained in an unconstitutional search or seizure so long as the State "provided an

---

[8] As an alternative to vacating his conviction, Mr. Matthews requests that we remand to the district court with instructions to hold an evidentiary hearing on his ineffective assistance claims. But Mr. Matthews is entitled to an evidentiary hearing only if "his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Bryan v. Mullin*, 335 F.3d 1207, 1214 (10th Cir. 2003) (en banc); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). And, as we have discussed, Mr. Matthews's allegations, even if assumed true, would not show that he received ineffective counsel; accordingly, we are constrained to deny his request for an evidentiary hearing.

opportunity for full and fair litigation" of Fourth Amendment claims. *Id.* at 494. The district court concluded Mr. Matthews received such an opportunity.

We review *de novo* the district court's conclusion that a petitioner had a full and fair opportunity to litigate a Fourth Amendment claim in state court, *Smallwood v. Gibson*, 191 F.3d 1257, 1265 (10th Cir. 1999), and doing so agree with the district court in this case. In *Smallwood*, we held it sufficient that petitioner's trial counsel informed the trial court of the factual basis for a Fourth Amendment claim, appellate counsel presented the issue to the state appellate court on direct appeal, and the state courts "thoughtfully considered the facts underlying petitioner's Fourth Amendment claim" but rejected it on the merits by applying appropriate Supreme Court precedents. *Id.* That is exactly what happened in this case.

Our review of the state court record reveals that the Oklahoma courts gave extensive consideration to Mr. Matthews's Fourth Amendment claims. The trial court held a hearing where both parties argued the suppression issue. At that hearing, the State conceded that part of the investigator's affidavit in support of the warrant could not be considered because it relied on information obtained as a result of an arrest the OCCA had held to be unconstitutional. The trial court issued a written ruling denying the motion to suppress, finding sufficient information to establish probable cause even if the information gleaned from the illegal arrest was severed. On direct appeal, the OCCA held that the trial court correctly denied Mr. Matthews's motion to suppress the evidence. The OCCA explained that a statement by Tracy Dyer implicating Mr. Matthews

- 35 -

established probable cause because it was an admission against penal interest that is entitled to credibility under *United States v. Harris*, 403 U.S. 573, 583 (1971). *Matthews*, 45 P.3d at 916-17. On the question whether the affiant deliberately misled the magistrate and whether this should invalidate the search warrant, the OCCA explained that even if all material information had been provided to the magistrate, probable cause still would have been present, and the evidence was thus admissible under *Franks v. Delaware*, 438 U.S. 154 (1978). *Matthews*, 45 P.3d at 917-18. Mr. Matthews argues that Oklahoma misapplied Fourth Amendment doctrine in reaching these conclusions, but that is not the question before us. The question is whether he had a full and fair opportunity to present his Fourth Amendment claims in state court; he undoubtedly did.

Second, Mr. Matthews complains about the trial court's penalty stage jury instructions. To impose a sentence of death, under its instructions, the jury was required to find the existence of any aggravating circumstance beyond a reasonable doubt and that the aggravating circumstances outweighed mitigating circumstances. Mr. Matthews contends it should also have been instructed that it had to find *beyond a reasonable doubt* that aggravating factors outweighed the mitigating. The failure to include an instruction on this last point, Mr. Matthews contends, violated his Sixth Amendment rights. In his view, the question whether aggravating circumstances outweigh mitigating circumstances implicates a factual finding that increases the maximum penalty for his crime, and

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584, 588

(2002), require that juries make such factual findings beyond a reasonable doubt.[9]

The State argues that Mr. Matthews's claim is procedurally barred because Mr.

Matthews failed to raise this issue in his direct appeal.  Claims defaulted in state court on

adequate and independent state procedural grounds may not be considered by a federal

habeas court unless the petitioner can "demonstrate cause for the default and actual

prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501

U.S. at 750.  Mr. Matthews replies that he can meet this standard because his lawyer on

direct appeal provided ineffective assistance by failing to raise his *Apprendi/Ring* claim.

Whether or not it is barred procedurally, Mr. Matthews's *Apprendi* argument is

certainly barred on the merits by dint of our decision in *United States v. Barrett*, 496 F.3d

1079, 1107 (10th Cir. 2007).  There, we explained that the jury's determination that

aggravating factors outweigh mitigating factors is not a finding of fact subject to

*Apprendi* but a "highly subjective, largely moral judgment regarding the punishment that

a particular person deserves."  *Id.* at 1107 (citing *Caldwell v. Mississippi*, 72 U.S. 320,

---

[9]  The trial court instructed the jury as follows: "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you find that any such aggravating circumstances outweigh the finding of one or more mitigating circumstances.  Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole."  State Court Record at 2387.

340 n. 7 (1985)).  We are of course bound by this decision as the law of the circuit, and we likewise can hardly say that appellate counsel on direct appeal rendered constitutionally ineffective assistance by failing to raise a point of law that we have rejected as erroneous.  *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).[10]

*Affirmed.*

---

[10]  Mr. Matthews also argues that he is entitled to relief for cumulative error.  In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine "only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness."  *See Young*, 551 F.3d at 972 (quoting *Jackson v. Johnson*, 194 F.3d 641, 655 n.59 (5th Cir. 1999)) (emphasis omitted).  The OCCA rejected Mr. Matthews's cumulative error argument, *Matthews*, 45 P.3d at 924, and so do we.  At the guilt phase, the only errors we have identified are the prosecutor's questionable remarks; we do not think that, when put together, these remarks rendered the trial fundamentally unfair.  As for the penalty phase, Mr. Matthews can show, at best, that Juror #2 improperly communicated with an outsider before the penalty phase began and that, *perhaps*, his lawyer should have told the jury about his efforts to send his art proceeds to his daughter.  But, as we have noted, there is no evidence suggesting that the juror's communication had *any* effect on the death sentence.  And the likely impact of the art evidence would have been small.  We cannot say, as we must to reverse, that the combination of these errors rendered Mr. Matthews's trial unfair.