KELLY, Circuit Judge.
Respondent Mike Mullin, Warden of the Oklahoma State Penitentiary, appeals the district court’s order granting conditional habeas corpus relief in the form of a new trial to Petitioner Lonnie Richie, an Oklahoma state prisoner convicted of first degree murder and sentenced to death. The sole issue on appeal is whether defense counsel rendered ineffective assistance of counsel in cross-examining Dr. Robert Hemphill, a medical examiner employed by the State of Oklahoma. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.
Background
On August 28, 1991, Mrs. Laura Laun-hardt was kidnaped from a K-Mart parking lot in Tulsa, Oklahoma. She was then taken to an abandoned, storm-damaged *1119 home in a rural area. There her kidnappers bound Mrs. Launhardt’s hands and feet, tied a strap around her neck, and secured the strap to a clothes rod in a closet. On September 1, 1991, Mrs. Laun-hardt’s decomposing body was discovered by police investigators.
At trial, the state introduced testimony affirmatively linking Mr. Richie and an accomplice to the scene of the abduction and the subsequent sighting of Mrs. Laun-hardt at a location not far removed from the home where her body was eventually found. The state also introduced evidence implicating Mr. Richie in the use of the victim’s bank and credit cards in the days following her abduction to secure a hotel room for himself and his accomplice, finance a shopping spree, and pay for a trip to New Orleans with his former girlfriend.
In its efforts to obtain a first degree murder conviction, the state advanced the theory that Mr. Richie seized and lifted his victim’s ankles while she was bound and secured to the clothes rod, causing death by strangulation. The state presented evidence through Officer Roy Heim establishing that Mrs. Launhardt’s body was found with her hands bound behind her back and her dress pulled above her hands. The state argued repeatedly during its closing that the position of the body supported its theory of death. The state also solicited testimony from Dr. Hemphill establishing that the medical evidence was consistent with the state’s theory. We discuss Dr. Hemphill’s testimony extensively below.
Attempting to avoid a conviction predicated on malice aforethought, and therefore death penalty eligible, Mr. Richie’s defense largely rested on the contention that his victim was left alive, though restrained, by her kidnappers. In support, Mr. Richie offered expert testimony by Dr. Bernard Greenburg, a noted expert in forensic entomology, establishing Mrs. Launhardt’s time of death at 7:00 p.m. on August 30. Dr. Greenburg based his conclusion on the size of the maggots found on Mrs. Launhardt’s body and recorded during Dr. Hemphill’s medical examination. In addition, the defense solicited testimony on cross-examination from two police officers, Corporal Gary Meek and Officer Roy Heim, tending to support the “left-alive” theory.
Mr. Richie was subsequently convicted in the District Court of Tulsa County, Oklahoma, of first degree murder with malice aforethought, and alternatively felony murder, and other lesser offenses. He was sentenced to death. On direct appeal, the Oklahoma Court of Criminal Appeals (“OCCA”) affirmed his conviction and sentence for malice aforethought murder, but reversed the conviction for felony murder on the grounds that the judge had failed to properly instruct the jury. Richie v. State, 908 P.2d 268, 275, 280 (Okla.Crim.App.1995). Mr. Richie raised, inter alia, the issue of ineffective assistance of counsel for the first time in an application for post conviction relief. Mr. Richie’s application was denied.[1] Richie v. State, 957 P.2d 1192 (Okla.Crim.App.1998).
Thereafter, Mr. Richie sought habeas relief before the district court pursuant to *1120 28 U.S.C. § 2254. Mr. Richie raised twenty-one grounds for relief in his petition. The district court granted Mr. Richie an evidentiary hearing as to four grounds relating to assertions of ineffective assistance. Following the hearing, the magistrate judge filed a report and recommendation concluding that Mr. Richie was denied effective assistance of counsel at trial and recommending that the district court grant the petition for a conditional writ of habeas corpus. Over the objections of the state, the district court adopted the report and recommendation, entering an order conditionally granting habeas relief. This appeal followed.
Discussion
On appeal from the grant of habeas relief, we review the district court’s factual findings for clear error and its legal conclusions de novo. Sallahdin v. Mullin, 380 F.3d 1242, 1247 (10th Cir.2004). The district court concluded in this case that Mr. Richie’s counsel was constitutionally deficient in cross-examining the medical examiner, Dr. Hemphill, and that this deficiency so prejudiced the defendant as to necessitate a new trial.
The Supreme Court enunciated the now familiar test for ineffective assistance of counsel claims in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on such a claim, the convicted defendant first has the burden to demonstrate that his counsel’s performance was “deficient,” i.e., that the “representation fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. Next, the defendant must show that his “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Id. at 687, 104 S.Ct. 2052. A reviewing court need not address the Strickland prongs sequentially. Bryan v. Mullin, 335 F.3d 1207, 1216 (10th Cir.2003). Moreover, a determination that the defendant fails to satisfy one prong precludes further analysis. Id.
With respect to the first prong of the Strickland test, the Court emphasized that “[jjudicial scrutiny of counsel’s performance must be highly deferential.” Id. at 689, 104 S.Ct. 2052. “The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Id. at 688, 104 S.Ct. 2052. The inquiry must embrace all relevant circumstances of the case, and there is a strong presumption that counsel has rendered effective assistance and made decisions in the exercise of reasonable judgment. Id. at 690, 104 S.Ct. 2052. Finally, those decisions alleged to be deficient must not be viewed in a vacuum; the court must assess such actions from the vantage point of counsel at the time of their making and with all relevant facts in mind. Id.
Having carefully reviewed the record, we hold that the district court erred in concluding that defense counsel’s cross-examination of Dr. Hemphill was constitutionally deficient. The district court failed to accord sufficient deference to counsel’s performance and appropriately consider all relevant circumstances attending Mr. Richie’s trial. Based on the evidence presented at trial and all relevant circumstances attending thereto, defense counsel’s cross-examination of Dr. Hemphill was reasonable and entitled to deference.
I. Defense Counsel’s Communications with Dr. Hemphill
Mr. Richie’s claims center almost exclusively on Dr. Hemphill’s testimony. According to the testimony of defense counsel and the deposition of Dr. Hemphill received at the evidentiary hearing, the two met prior to trial to discuss Mr. Ri *1121 chie’s case. III ApltApp. at 610, 882. While counsel’s and Dr. Hemphill’s accounts of the meeting differ, counsel evidently left the meeting under the impression that the medical examiner viewed the state’s theory of death as improbable, while viewing the defense’s theory as plausible. Id. at 610; but see id. at 886-88 (providing Dr. Hemphill’s recollection). Proceeding on the assumption that Dr. Hemphill was a “defense witness,” Mr. Richie’s counsel chose not to prepare another expert witness for trial. Id. at 612. In recalling this decision, defense counsel noted that the alternate witness was in basic agreement with Dr. Hemphill’s conclusions. Id.
During trial, but prior to testifying, Dr. Hemphill pulled defense counsel aside and informed her that, after considering a statement made by Mr. Richie’s co-defendant, Danny Waller, he did not want “to blind-side her, so-to-speak” and intended to testify that the state’s theory of the manner of death was consistent with the evidence.[2] Id. at 613, 890-93. Again, accounts of the conversation differ. While Dr. Hemphill minimized the significance of the conversation by explaining that this testimony would be responsive to those questions posed by the state, whatever they might be, id. at 891-95, defense counsel testified at the evidentiary hearing that the conversation left her “devastated.”[3] Id. at 614.
II. Dr. Hemphill’s Trial Testimony
Dr. Hemphill testimony at trial was somewhat limited. On direct examination, he testified that the cause of death was “asphyxiation by ligature.” VII Aplt.App. at 2078. Elaborating, Dr. Hemphill noted:
Based on the circumstances under which the body was found, that is that it was partially suspended by this ligature being tied to a clothes bar or something like that in a closet, that she was lying face down with her face slightly off the floor, partially suspended in that sense, it’s my opinion that suspension or partial suspension as in hanging probably played a major part in the mechanism, that is in putting enough pressure from this ligature on the blood vessels of the neck to cause asphyxiation.
Id. at 2079. Dr. Hemphill further testified to his opinion that “overwhelming evidence” indicated that Mrs. Launhardt’s death was a homicide. Id. at 2083. In other words, “somebody else did this to her, she didn’t do it to herself.” Id. However, the doctor continued:
Beyond that there’s not a whole lot more that I can say. I don’t know how many people were involved. I don’t have any evidence to indicate that. I don’t know exactly what the person did. In what sequence and what he might have said or anything else.
*1122 All I can say is that this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found.
Id. at 2084. Dr. Hemphill’s sole testimony relating to the manner of death occurred in the following exchange.
Q: (By Mr. Gillert [the prosecutor]) Let me ask you this hypothetical: If someone were to bind her hands behind her and bind her feet as she was found, tie the ligature around her neck and tie it to the pole with the length of the rope, would it be consistent with your findings that they suspended the person by some lower extremity while they hung to affect the death in the manner in which you found, is that consistent?
A: Yes. As far as I can see, it would be consistent.
Id. at 2084-85.
Finally, Dr. Hemphill testified to the time of death based on the condition of the body, placing the victim’s death at approximately 72 hours prior to discovery of her body. Id. at 2102. However, Dr. Hemp-hill qualified his testimony by stating:
So understanding that other evidence might — other evidence of a definitive nature might turn out — turn up somewhere, I don’t know of any, but it might turn up indicating that this is not correct. My best estimate would be that probably somewhere between the time shortly after the time of disappearance and about 72 hours prior to her being found is when death occurred.

Id.

The record discloses that throughout Dr. Hemphill’s testimony, defense counsel vigorously objected on numerous grounds. See, e.g., id. at 2079-84 (objecting as to Dr. Hemphill’s opinion of “most likely” explanation of death and the doctor’s reliance on Waller’s statement), at 2085 (moving for mistrial after Dr. Hemphill obliquely referred to statement by Waller), at 2090 (same). In so doing, defense counsel was successful in limiting Dr. Hemphill’s testimony as to simply whether the prosecution’s theory was consistent with the evidence, id. at 2082, and in obtaining a court admonishment that the jury should disregard the doctor’s reference to Waller’s statement. Id. at 2085.
Defense counsel’s cross-examination of Dr. Hemphill was indeed brief, as she repeatedly iterated it would be. Id. at 2103. Given its importance to our analysis, we reproduce it in its entirety.
Q First of all, Doctor, you have no medical evidence to show that the death occurred anywhere but Pawnee County; is that correct?
A That’s correct.
Q Secondly, the larvae or maggots that you’ve testified about from your report, they vary in length from 2 millimeters to 1 centimeter?
A Let me just double cheek my notes. Yes, that is correct.
Q And you did not collect any of these; is that right? Preserve any of them? A That’s correct.
Q And finally, Doctor, you have no medical evidence that is inconsistent with Ms. Launhardt being tied, restrained in that closet in a sitting or standing position, correct?
A That’s correct.
Id. at 2103-04. There was no redirect.
III. The District Court’s Conclusions
Having reviewed the trial and evidentia-ry hearing records, the district court found that Mr. Richie had been denied effective assistance of counsel. Its reasoning is set forth in the magistrate’s Report and Recommendation and the district court’s own *1123 Order. The district court concluded that Dr. Hemphill provided the only evidence supporting the state’s theory and that defense counsel allowed the state’s presentation of its theory through the doctor to go unchallenged. II Aplt.App. at 575-76. Noting that Dr. Hemphill was willing to testify that the defense’s theory was consistent with the evidence, the district court found that the “inadequacy of the cross-examination” was evident on the face of the trial record and that defense counsel inexcusably lost the opportunity to present its theory through Dr. Hemphill’s testimony. Id. at 576.
The magistrate judge concluded that following the conversation with Dr. Hemphill, defense counsel could have taken any number of actions which might have affected the outcome of the case. Id. at 524. Defense counsel could have asked for a continuance or short break in the proceedings. Id. Moreover, defense counsel could have sought additional expert testimony, though the benefit of such testimony is not entirely clear. Id.
Having found defense counsel’s performance constitutionally deficient, the district court then concluded that Strickland’s prejudice prong was likewise satisfied. The court posited that defense counsel had failed in general to advance Mr. Richie’s theory of the case and had failed to require the state to meet its burden.
IV. The District Court Erred in Determining that Defense Counsel Rendered Ineffective Assistance
The deferential standard established in Strickland stems from the inherent disadvantage of our perspective. We are left with a cold record, augmented by testimony produced in evidentiary hearings that benefits in its acuity from‘the passage of time. In fact, all too frequently we are confronted with trial counsel denigrating their own performance. We do’ not> question counsel’s motives or sincerity. However, avoiding the pitfalls of hindsight, our present duty is to “judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (emphasis added).
What then were the circumstances confronting defense counsel at the time of Dr. Hemphill’s cross-examination? We note at the outset that the district court clearly erred in finding that Dr. Hemphill provided the only evidence supporting the state’s theory. We agree with the state that testimony by Officer Heim establishing the position of the victim’s dress at the time her body was discovered, coupled with photographs of the crime scene, also provided evidence supporting the state’s theory.[4]
Turning to the additional circumstances present in the case, consistent with the findings of the magistrate judge adopted by the district court we assume that defense counsel was indeed surprised by the conversation she had with Dr. Hemphill prior to his taking the witness stand. However, by the time .defense counsel rose to cross-examine Dr. Hemphill, the parameters of the case were clear. The prosecution had presented no direct evidence establishing the manner of the victim’s death. As demonstrated in the portions of his direct testimony quoted above, Dr. *1124 Hemphill’s witness-stand assertions were hardly absolute, leaving both sides room to maneuver. Furthermore, defense counsel had successfully precluded the medical examiner from testifying as to the manner of death he thought most likely. By the close of direct examination, the state had only established that its theory would be “consistent” with the medical evidence.
At the same time, defense counsel was aware that she had solicited testimony from Corporal Meek supporting the theory that the defendant had been left alive. VII Aplt.App. at 2032. She had also solicited testimony from Officer Heim establishing that until the moment of the discovery of the body, having been led to the scene of the crime by Mr. Richie’s accomplice, the police had treated the case as one involving a missing person, as opposed to a homicide. Id. at 2054. Furthermore, defense counsel could anticipate testimony from Dr. Greenburg establishing the victim’s death at a time when Mr. Richie was traveling in a stolen van to New Orleans. Finally, defense counsel was aware that the other pathologist she had consulted was in basic agreement with Dr. Hemp-hill’s original opinions. It is under all these circumstances that we must review defense counsel’s cross-examination and handling of the case.
We have previously noted that counsel’s decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy. See Pickens v. Gibson, 206 F.3d 988, 1001-02 (10th Cir.2000); Boyd v. Ward, 179 F.3d 904, 915 (10th Cir.1999). Nothing in the record would lead us to a contrary conclusion here. Although defense counsel understandably may have felt “devastated” by her conversation with Dr. Hemphill, her conduct during his testimony was aggressive and successful. It is counsel’s objective performance that must guide our inquiry. With this in mind, the line of questioning pursued during cross-examination objectively represents a responsive, tactical choice. We disagree with the district court’s conclusion that counsel’s cross-examination was deficient on the face of the record.[5] Experience teaches that rarely can performance be measured by the length of cross-examination alone. In this case, counsel engaged in a succinct line of questioning going to the heart of her case. Questions were posited regarding the size of the maggots on Mrs. Laun-hardt’s body to support the anticipated testimony of Dr. Greenburg. Moreover, defense counsel established through the testimony of Dr. Hemphill that the victim could have been tied or restrained in a sitting or standing position.[6] While it is *1125 true that defense counsel did not explicitly ask whether the evidence was consistent with the victim being left alive, we cannot say that this single omission, if it was that, under all the circumstances present renders counsel’s performance constitutionally deficient.[7] Finally, given the measured and qualified nature of Dr. Hemphill’s testimony, we will not find fault in counsel’s decision to eschew further expert testimony, that based on counsel’s own statements, may indeed have proved duplicative. Moreover, a longer cross-examination of Dr. Hemphill may have resulted in more resolute testimony, and a redirect examination reinforcing the state’s theory of the case.
Having reached the conclusion that the district court erred in finding Mr. Richie’s counsel constitutionally ineffective in cross-examining Dr. Hemphill, our inquiry ceases. We need not address arguments relating to Strickland’s prejudice prong. Bryan, 335 F.3d at 1216. Accordingly, we REVERSE the conditional grant of a writ of habeas corpus. In that the district court has not addressed many of Mr. Richie’s remaining arguments in his petition, we REMAND for further proceedings not inconsistent with this opinion.

. This case does not implicate deference concerns under the Antiterrorism and Effective Death Penalty Act because the issue is res nova. See 28 U.S.C. § 2254(d). The OCCA found that Mr. Richie's ineffective assistance claim was procedurally barred. Richie, 957 P.2d at 1196. Relying in part on our decision in Cargle v. Mullin, 317 F.3d 1196, 1212 (10th Cir.2003) (holding that Oklahoma's procedural bar rule does not preclude consideration of matters outside the trial court record during federal habeas review), the district court properly determined that the OCCA’s decision did not bar review of Mr. Richie's claim. II Aplt.App. at 573.

. In one of several contradictory statements, Danny Waller informed the police that Mr. Richie had held Mrs. Launhardt by her ankles while she was suspended by the strap, causing her death by strangulation. Waller has since recanted this statement in testimony that was not without further contradiction. Ill Aplt.App. at 705. At trial, Mr. Richie asserted that it was improper for the medical examiner to rely on inadmissible hearsay in making determinations as to cause and manner of death. This precise issue is not before us.

. The dissent emphasizes the consistency of defense counsel's testimony at the evidentiary hearing with Dr. Hemphill's testimony and her purported reaction to the conversation during trial. We note, however, that the state telegraphed Dr. Hemphill's testimony during its opening statement, calling into question defense counsel's recollected feelings of surprise.

. The dissent argues erroneously that "[i]n the pictures discussed by the witnesses, Mrs. Launhardt's skirt had been moved to display the ligatures on the victim's wrists.” Dissent at 9. However, the testimony of Officer Heim makes, clear that State's Exhibit 23 depicted the .victim in the position in which she was found. Collectively, the photographs provided strong evidence supporting the prosecution’s theory.

. The dissent asserts that we owe deference to the magistrate judge’s credibility determinations respecting defense counsel's assertion at the evidentiary hearing that her conversation with Dr. Hemphill prior to his testimony left her devastated. The dissent notes that "[a]n appellate court's suspicion that a witness had an incentive to shade her testimony regarding her past thoughts and emotions is insufficient to justify overruling a lower court's credibility determination.” Dissent at 15. Contrary to this assertion, we have not disturbed any determination touching on the credibility of the witnesses in the evidentiary hearing. The district court did not rely on the magistrate judge’s credibility determination in finding that counsel's performance was deficient; the district court did so on the face of the trial record. Our conclusion in this case flows from the de novo review of that determination. The dissent's apparent deference to the credibility determination of the magistrate judge in this context is both immaterial and misplaced.

. The dissent contends that defense counsel's question whether Mrs. Launhardt might have been tied or restrained in a sitting or standing position "could have served as the opening salvo in an effective line of questioning, but without more, it must have seemed to the jury more a confirmation of guilt than a step in a line of defense.” Dissent at 19. The dissent's *1125 contention is steeped in gross speculation and underscores the dangers inherent when an appellate court seeks to animate a cold record, substituting well-intentioned assumptions drawn at some remove for equally plausible explanations supported by the actual trial record. Far from serving as a “confirmation of guilt,” the logical inference to be drawn from defense counsel's question, that Mrs. Laun-hardt was left alive in such a position, stood in direct contradiction to the state's theory. Indeed, it was just this inference that defense counsel emphasized in closing argument.

. Defense counsel emphasized the inconclusiveness of Dr. Hemphill's direct testimony and made the following statement during closing arguments: "But [Dr. Hemphill] also says on the same hand, same balance, that the medical evidence is consistent with [the victim] being restrained, but alive. That she was left there restrained, but alive and he said there’s nothing inconsistent with that." VIII Aplt.App. at 2228-29. No objection was noted, and the context of the statement might well reflect an argument from inference. While the magistrate judge was arguably correct in noting that this statement was not consistent with Dr. Hemphill's actual testimony, we believe counsel's argument further underscores the danger inherent in second-guessing reasoned decisions during the course of cross-examination.