FILED
United States Court of Appeals
Tenth Circuit

March 25, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENT CIRCUIT

LONNIE WRIGHT RICHIE,

    Petitioner -
Appellant/Cross-Appellee,

    v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

    Respondent -
Appellee/Cross-Appellant.

Nos. 08-5091 and 08-5095

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:98-CV-00482-TCK-SAJ)**

---

Randy A. Bauman (Timothy R. Payne, with him on the briefs), Assistant Federal Public Defenders, Oklahoma City, Oklahoma, for Petitioner - Appellant/Cross-Appellee.

Seth S. Branham, Assistant Attorney General, (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the briefs), Oklahoma City, Oklahoma, for Respondent - Appellee/Cross-Appellant.

---

Before **TACHA**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Lonnie Richie was convicted in Oklahoma state court of the first-degree murder of Laura Launhardt and sentenced to death. He was also convicted of kidnapping for extortion, robbery with a firearm, unauthorized use of a debit card, and larceny of a vehicle. After unsuccessfully seeking relief in state court, Mr. Richie filed an application for habeas corpus relief under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Oklahoma. The district court set aside the murder conviction on the ground that the trial court should have instructed the jury on the lesser-included offense of second-degree depraved-mind murder. It also ruled that even if the conviction were upheld, the death sentence should be set aside because Mr. Richie's trial counsel was ineffective at the trial's penalty phase for not exploring or presenting mitigating evidence of his brain damage. *See Richie v. Sirmons*, 563 F. Supp. 2d 1250 (N.D. Okla. 2008). The court granted no relief with respect to Mr. Richie's other convictions.

The state appeals, urging reversal of the relief granted below. Mr. Richie cross-appeals, raising five grounds for relief that were rejected by the district court. We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's judgment.[1]

---

[1]This court consolidated the state's appeal in Case No. 08-5091 and Mr. Richie's appeal in Case No. 08-5095. For purposes of briefing and argument, we designated Mr. Richie as the Petitioner-Appellant/Cross-Appellee and the state as Respondent-Appellee/Cross-Appellant. *See* Case Management Order at 1,

(continued...)

We agree with the district court that Mr. Richie's conviction of first-degree murder must be set aside because he was entitled to an instruction on the lesser-included offense of second-degree depraved-mind murder. Mrs. Launhardt's body was found in an abandoned house with her arms and legs bound and a cord around her neck that was tied to a clothes rod. On the evidence at trial a rational juror (1) could have voted to acquit Mr. Richie of first-degree murder because of a reasonable doubt that he intended to kill Mrs. Launhardt but (2) still have found beyond a reasonable doubt that he caused her death by depraved conduct creating an imminent danger of her death. Because our ruling on this issue will require a new trial on the charge of first-degree murder, we need not address any of the other issues that relate only to Mr. Richie's conviction or sentence for that offense. There remains only one issue. Mr. Richie contends that all his convictions must be set aside because several jurors were biased against him for not testifying but concealed this bias during voir dire. We reject this contention because it is not supported by admissible evidence.[2]

---

[1](...continued)
*Richie v. Workman*, Nos. 08-5091 and 08-5095 (10th Cir. Aug. 5, 2008).

[2]The other claims raised by Mr. Richie's appellate briefs are (1) that his Sixth Amendment right to confrontation was violated when the medical examiner implicitly testified to statements by his accomplice in the murder, (2) that his trial counsel was ineffective in failing to investigate and present evidence that his victim's death was unintentional, (3) that the prosecution violated the Due Process Clause of the Fourteenth Amendment by failing to disclose statements by Mr. Richie's accomplice that the victim was left alive, (4) that the trial jury

(continued...)

## I.    BACKGROUND

At about 1 p.m. on August 28, 1991, Mr. Richie and his accomplice Daniel Waller, who was 16 at the time, robbed and kidnapped Mrs. Launhardt at the parking lot of a Kmart in Tulsa, Oklahoma.  Her husband reported her missing to Tulsa police late that afternoon.  When the police did not immediately begin an investigation, he called the vendors of some of his wife's credit cards to see if the cards had been used since her disappearance.  He discovered that his wife's ATM card had been used at a Git-N-Go store in Muskogee, Oklahoma, about 40 miles from Tulsa.  The store had a surveillance camera, and Muskogee police retrieved the tape, which Mr. Launhardt reviewed.  He did not recognize the two men using his wife's credit card.  This was reported to Tulsa police, who became more actively involved.  Their investigation led to a motel near the Git-N-Go where Mr. Richie had used an assumed name in renting a room for himself and Mr. Waller.  While officers were searching that room on September 1, Mr. Waller arrived.  He admitted to the kidnapping, and then led the officers to an abandoned house where they found Mrs. Launhardt's body in a walk-in closet.

Mrs. Launhardt's body was on the floor lying face-down, with her head raised slightly by a "cargo strap" around her neck that was tied to the closet's

---

[2](...continued)
should have been given a lesser-included instruction on second-degree felony murder, and (5) that the jurors were biased because they believed that death was the only appropriate penalty for first-degree murder.

horizontal clothes rod.  *Id.* at 2040.  The closet was otherwise empty.  The strap

was about five feet long, not quite long enough for Mrs. Launhardt to lie on the

floor without being choked.  Her ankles were tied together two to three inches

apart with a "sash cord" that appeared to match cord found elsewhere in the

house.  *Id.* at 2041–42.  Her hands were tied tightly together behind her back by

the same type of sash cord.  A carpet knife lay on the floor of the adjacent

bathroom.

Tulsa police officer Roy Heim testified about the location and

neighborhood of the abandoned house:

> The area that we were led to is, I think called West Port, it's a small
> undeveloped area or very sparsely developed, it's got a few houses in
> it.  The roads there are small and rugged, gravel roads, in some cases,
> partially paved.  There had been a lot of storm damage in the area
> and a lot of debris that was still left on the ground, a lot of repairs
> going on in the neighborhood.  Of the houses, most of them were
> damaged, it appeared, of some sort or another.
>
> . . . .
>
> It was nighttime when we arrived there and we were directed down
> the small roads into the addition about a block, 2 blocks to the right
> and down a very small road to the left about a block and then left
> again and right at the corner or turn in the road, was an abandoned
> house.

Aplt. App., Vol. VII at 2038.  He described the house as a tri-level with severe

damage to the back side.  It contained no furniture.  The closet and bathroom

were in disrepair.  The closet ceiling had an 18-inch-square opening to the

outside.

-5-

Meanwhile, Mr. Richie had left Oklahoma with a former girlfriend, Christy Windle. He had called her the evening of August 28 (the day of Mrs. Launhardt's abduction) and then visited her home in Muskogee, showing her Mrs. Launhardt's van, which he claimed to have bought. They then departed on August 30, apparently in the morning, and drove in the van to New Orleans. He had a pistol in the van. Mr. Richie was arrested at a Greyhound bus terminal in New Orleans on September 5, 1991. A search of the van, which was parked by the terminal, discovered ammunition usable by the pistol.

At trial the state contended that Mr. Richie had killed Mrs. Launhardt by deliberately strangling her. Its theory was that after Mr. Richie and Mr. Waller tied her up, they lifted her feet and held them in the air until the weight of her body on the ligature around her neck caused her to die of asphyxiation. Mr. Richie's counsel argued that he had intended only to restrain Mrs. Launhardt and had left her alive in the abandoned house.

The jury found Mr. Richie guilty of first-degree murder and rendered its death-penalty verdict on September 27, 1993. He was also convicted of kidnapping for extortion, robbery with a firearm, unauthorized use of a debit card, and larceny of a vehicle. The Oklahoma Court of Criminal Appeals (OCCA) affirmed the convictions and sentences, *see Richie v. State*, 908 P.2d 268, 280 (Okla. Crim. App. 1995), and the United States Supreme Court denied a petition for a writ of certiorari, *see Richie v. Oklahoma*, 519 U.S. 837 (1996).

Mr. Richie's petition to the OCCA for postconviction relief was likewise denied. *See Richie v. State*, 957 P.2d 1192, 1198 (Okla. Crim. App. 1998).

Mr. Richie filed his § 2254 application in federal district court on February 10, 1999. After an evidentiary hearing the court granted habeas relief on April 26, 2004, ruling that his first-degree murder conviction must be set aside because his trial counsel was ineffective in cross-examining the medical examiner who testified for the state. We reversed and remanded. *See Richie v. Mullin*, 417 F.3d 1117, 1125 (10th Cir. 2005). The district court then addressed the remaining grounds for relief raised by Mr. Richie. *See Richie*, 563 F. Supp. 2d at 1268–1315. It rejected 19 grounds, but (1) set aside his first-degree murder conviction on the ground that the trial court did not instruct the jury on the lesser-included offense of second-degree murder, *see id.* at 1281–86, and (2) set aside the sentence of death (in the event that the district court was reversed on the first ground for relief) because Mr. Richie's trial counsel was ineffective in not properly investigating whether he was brain-damaged, *see id.* at 1288–92. The state appealed and Mr. Richie cross-appealed. As previously stated, we need address only two issues: (1) Mr. Richie's entitlement to a lesser-included-offense instruction on second-degree depraved-mind murder and (2) jury bias regarding his failure to testify.

## II. DISCUSSION

### A. Standard of Review

Before addressing the merits of the issues on appeal, we set forth the appropriate standard of review. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, a federal court can grant habeas relief only if the applicant establishes that the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). "Under the 'contrary to' clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted). And the "unreasonable application" clause permits relief only if the state court identifies the correct governing legal principle in Supreme Court decisions but unreasonably applies that principle to the facts of the case. *See id.* Under neither clause is relief available simply because the federal court independently reasons that the relevant state-court decision erroneously or incorrectly applied clearly established federal law. *See id.* Rather,

that application must have been unreasonable. Moreover, under § 2254(e)(1) a state-court fact finding is binding on the federal courts unless rebutted by clear and convincing evidence.

## B.     Lesser-Included-Offense Instruction

Mr. Richie contends that his conviction of first-degree murder must be set aside because the trial court violated *Beck v. Alabama*, 447 U.S. 625 (1980), which requires the court in a capital case to give a requested lesser-included-offense instruction that is supported by the evidence. He argues that the trial judge should not have denied his request for a lesser-included instruction on second-degree depraved-mind murder.

In general, when an offense is a lesser-included offense of the charged offense, a lesser-included instruction is permissible if a rational juror viewing the evidence at trial could find the accused not guilty of the greater offense but guilty of the lesser one. *See Keeble v United States*, 412 U.S. 205, 208 (1973) ("[T]he defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."); *Malone v. State*, 876 P.2d 707, 711 (Okla. Crim. App. 1994) ("[T]he trial court must instruct the jury on every degree of homicide where the evidence would permit the jury rationally to find the accused guilty of the lesser offense and acquit him of the greater.").

An instruction on a lesser-included offense may "be beneficial to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." *Beck*, 447 U.S. at 633. More importantly, the Supreme Court has held that such an instruction can "ensure[] that the jury will accord the defendant the full benefit of the reasonable-doubt standard." *Id.* at 634. Theoretically, a jury should not convict on the greater offense unless it finds all the elements of the offense beyond a reasonable doubt. According to the Court, however, there is a "substantial risk" that when a defendant "is plainly guilty of *some* offense" but the jury does not receive a lesser-included instruction, a jury confronted with either convicting of the greater offense or setting the defendant free may choose to convict despite a reasonable doubt. *Id.*; *see id.* at 637 ("[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with  respect to an element that would justify conviction of a capital offense—the failure to give the jury the third option of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." (internal quotation marks omitted)). Accordingly, the Court held that a defendant in a death-penalty case is constitutionally entitled to a requested lesser-included instruction if it is supported by the evidence. *See id.* at 627. Whether an offense is a lesser-included offense is a matter of state law. *See Taylor v. Workman*, 554 F.3d 879, 888 (10th Cir. 2009).

The state concedes that under Oklahoma law at the time of Mr. Richie's trial in 1993, second-degree depraved-mind murder was a lesser-included offense of first-degree murder. *See Willingham v. Mullin*, 296 F.3d 917, 922–23 (10th Cir. 2002) ("Prior to . . . 1997, the OCCA considered second degree murder a [lesser-included offense] of first degree murder."). Therefore the question before us is whether the evidence at trial justified an instruction on second-degree depraved-mind murder. That is, could a rational juror at Mr. Richie's trial have harbored a reasonable doubt that Mr. Richie was guilty of first-degree murder but still have found him guilty beyond a reasonable doubt of second-degree depraved-mind murder? To answer this question we must review the elements of the two offenses and examine the evidence at trial.

According to the OCCA, at the time of Mrs. Launhardt's murder "[t]he elements of first degree malice murder [were]:

    1) unlawful
    2) death of a human
    3) caused by another
    4) with malice aforethought."

*Willingham v. State*, 947 P.2d 1074, 1081 (Okla. Crim. App. 1997); *see* Okla. Stat. Ann. tit. 21, § 701.7(A) (1991) ("A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable

of proof."); *Black v. State*, 21 P.3d 1047, 1066 (Okla. Crim. App. 2001) ("The use of 'deliberate intent' in the definition of malice in Oklahoma connotes an intent that is thought out or considered before commission of the fatal act."). And the parties agree that the elements of second-degree depraved-mind murder at the time of the murder are set forth in *Taylor v. State*, 998 P.2d 1225 (Okla. Crim. App. 2000), which states that they are:

1. death of a human;
2. caused by conduct which was imminently dangerous to another person;
3. the conduct was that of the defendant;
4. the conduct evinced a depraved mind in extreme disregard of human life;
5. the conduct is not done with the intention of taking the life of any particular individual.

*Id.* at 1231; *see* Okla. Stat. Ann. tit. 21, § 701.8(1) (1991) ("Homicide is murder in the second degree . . . [w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.").

Mr. Richie argues that a rational juror could have found that he and Mr. Waller had left Mrs. Launhardt alive in the closet and that later she "expired through somnolence or other accident or misfortune relating to the restraint around her neck." Aplt. Br. at 13. A juror who so believed could have acquitted Mr. Richie of first-degree murder because he did not act with malice aforethought

-12-

(that is, with premeditation), but still have convicted him of second-degree

murder because he left Mrs. Launhardt in an imminently dangerous position with

extreme disregard for whether she would ever escape or be found alive, although

he lacked the intent to kill her.

The OCCA, however, rejected Mr. Richie's claim that he was entitled to the

lesser-included instruction. On direct appeal it said:

> [Mr. Richie] . . . asserts that the trial court's failure to issue a second
> degree "depraved mind" murder instruction resulted in reversible
> error. Jury instructions on lesser offenses are only appropriate when
> there is evidence which would reasonably support the finding of the
> offense. *Crumley v. State*, 815 P.2d 676, 678 (Okl.Cr.1991).
> Furthermore, this Court has "long held that the giving of instructions
> on lesser included offenses is within the sound discretion of the trial
> court. . . ." *Id.* Therefore, absent error, this Court will not intervene.
> *Id.*; *Fowler v. State*, 779 P.2d 580, 585 (Okl.Cr.1989), *cert. denied*,
> 494 U.S. 1060 (1990). The trial court's failure to give an instruction
> on second degree murder did not constitute an abuse of discretion.
> Accordingly, this proposition of error fails.

*Richie*, 908 P.2d at 276. We begin our review by considering whether the

OCCA's decision is entitled to deference.

Mr. Richie contends that AEDPA deference is not warranted because the

OCCA decision "was contrary to . . . clearly established federal law." 28 U.S.C.

§ 2254(d)(1). He asserts that the OCCA failed to follow the Supreme Court's

requirement that a lesser-included instruction be given in a capital case if "the

evidence would have supported such a verdict." *Beck*, 447 U.S. at 627 (internal

quotation marks omitted). He argues that the OCCA reviewed the trial court's

-13-

denial of the instruction under an abuse-of-discretion standard, rather than just determining whether the evidence would support the lesser-included instruction.

There is some merit to Mr. Richie's contention. The OCCA did note that a lesser-included instruction is appropriate only "when there is evidence which would reasonably support the finding of the offense." *Richie*, 908 P.2d at 276. But it then said that giving such an instruction "is within the sound discretion of the trial court." *Id.* (internal quotation marks omitted). If the OCCA is saying that the trial court has discretion to deny a lesser-included instruction even when the evidence would support giving the instruction, its test differs materially from that in *Beck*. *But cf. United States v. Chapman*, 615 F.2d 1294, 1298 (10th Cir. 1980) ("The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge.") And we owe no deference to a state-court decision when it applies a legal rule that differs materially from the rule mandated by the United States Supreme Court. *See Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) ("The deferential AEDPA standards of review do not apply if the state court employed the wrong legal standard in deciding the merits of the federal issue." (internal quotation marks omitted)).

We question, however, whether the OCCA would affirm the denial of a lesser-included instruction when there is sufficient evidence to support it. Its decisions sometimes mention an abuse-of-discretion test; but they uniformly state

-14-

that a lesser-included instruction is appropriate when evidence supports the instruction, and its decisions commonly do not mention abuse of discretion. *See, e.g., Harris v. State*, 84 P.3d 731, 750 (Okla. Crim. App. 2004) (not using abuse-of-discretion language); *Shrum v. State*, 991 P.2d 1032, 1034 (Okla. Crim. App. 1999) ("This Court has traditionally held that the trial court instructing the jury on all possible verdicts, especially in homicide cases, must include all lesser included offenses supported by the evidence."); *Fowler v. State*, 779 P.2d 580, 585 (Okla. Crim. App. 1989) (not using abuse-of-discretion language). It may be that the OCCA would automatically find an abuse of discretion when the trial court rejects a lesser-included instruction despite sufficient evidence to support it. We have found no OCCA opinion affirming the denial of a lesser-included instruction that it decided to be supported by the evidence, and Mr. Richie's counsel admitted at oral argument in this court that he knew of none. Thus, it is hardly certain that the OCCA failed to apply the correct federal law.

In any event, we need not resolve that issue. Even granting AEDPA deference to the OCCA's decision, we must reverse. We hold that the OCCA unreasonably applied *Beck* in affirming the denial of Mr. Richie's requested second-degree-murder instruction.

Considerable evidence at trial could create doubt that Mr. Richie intended to kill Mrs. Launhardt by strangling her with the ligature around her neck. First, the jury convicted Mr. Richie of robbery of Mrs. Launhardt with a firearm. It

thus found beyond a reasonable doubt that he had a pistol during the episode. If he had wanted to kill her, he could have simply shot her. The state concedes that the house was in a remote location; a gunshot would likely not have been heard by others (and perhaps Mr. Richie could have quietly killed her with the carpet knife in the house).

Second, the prosecution's theory of the murder seems bizarrely complicated. If the perpetrators were intent on strangling Mrs. Launhardt, there were much simpler methods to do that than bind her as they did and then lift her legs until the strap around her neck choked her.

Finally, and most telling, there was significant evidence that Mrs. Launhardt died well after Mr. Richie had left the abandoned house. Testifying for the defense was Dr. Bernard Greenburg, professor emeritus at the University of Illinois at Chicago, who was an expert in forensic entomology. He had taught in the field since 1951, served as a consultant in 50 cases, and testified regarding the time of death in "approximately 17 homicide trials" for both the defense and prosecution. Aplt. App., Vol. VIII at 2145, 2146–47. He has "spent [his] life studying the biology, the behavior, the distribution, all the habits of flies that are common flies," and authored over 100 scientific-journal articles and 2 books that he claims had "become a kind of standard throughout the world in terms of [the] biology" of the flies of interest in this case. *Id.* at 2146.

Forensic entomologists determine the time of death by examining the size of fly maggots on the body. After flies lay eggs on the body, maggots begin to develop through a documented development cycle, and a forensic entomologist uses the extent of the maggots' development to determine how long it had been since the flies discovered the body.

Dr. Greenburg applied this methodology in examining the maggots found on Mrs. Launhardt's body, which came from three types of carrion flies. He explained that the three types are abundant in the Midwest and have keen senses of smell, enabling them to detect a corpse very quickly from up to "a mile away". *Id.* at 2148. They find a body "within a few hours" of death, and often much sooner. *Id.* After finding the body they feed on it, and they begin to lay eggs several hours later. Based on the development of the maggots found on Mrs. Launhardt, Dr. Greenburg concluded that "without question" flies began to lay their eggs on her body during the evening of August 30. *Id.* at 2162. There would still be some uncertainty regarding the time of death, however, because one could not be sure how long it would take flies to find the body. Dr. Greenburg testified that it was "[m]ost probable . . . that the person was killed on the 30th and the flies laid eggs sometime that evening. Less probable, she was—she died on the 29th and the flies laid eggs on the evening of the 30th. And least probable, she died on the 28th and the flies did not find the body or lay eggs until the

evening of the 30th, at least." *Id.* at 2163. This evidence, if believed, would establish Mr. Richie's left-alive theory.

We are not persuaded by the state's arguments against a lesser-included-offense instruction. The state relies on the testimony of Dr. Robert Lee Hemphill, the Oklahoma state medical examiner, that Mrs. Launhardt's "cause of death was asphyxiation by ligature . . . at least 72 hours before discovery of the body." Aplee. 2d Br. on Cross Appeal at 23. But with respect to the time of death, the jury was not required to believe Dr. Hemphill over Dr. Greenburg, who set a significantly later time for Mrs. Launhardt's death.

And Dr. Hemphill was not definitive on how she was killed, except that it was a homicide (not a suicide or an accident) and that death resulted from strangulation caused by the ligature around her neck. His direct examination continued:

> A      Beyond that there's not a whole lot more that I can say. I don't know how many people were involved. I don't have any evidence to indicate that. I don't know exactly what the person did. In what sequence and what he might have said or anything else.
>
>           All I can say is that this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found.
>
> Q      (By [the prosecutor]) To the mechanism to accomplish the partial suspension, what about that? What is your opinion of that?
>
> A      Well really all that I can say from the evidence that I can see here and in my examination of the body is that it appears that—that as I said, someone partially suspended her, pulled her head up in this

position while she was face down and accomplished the asphyxiation in that matter. What else they may have done I don't know.

Aplt. App., Vol. VII at 2084. After the court overruled a defense objection, the prosecutor posed his theory of death:

> Q (By [the prosecutor]): Let me ask you this hypothetical: If someone were to bind her hands behind her and bind her feet as she was found, tie the ligature around her neck and tie it to the poll [sic] with the length of the rope, would it be consistent with your findings that they suspended the person by some lower extremity while they hung to affect the death in the manner in which you found, is that consistent?
>
> A Yes. As far as I can see, it would be consistent.

*Id.* at 2084–85. On cross-examination, however, Dr. Hemphill was asked, "Doctor, you have no medical evidence that is inconsistent with Ms. Launhardt being tied, restrained in that closet in a sitting or standing position, correct?"; and he answered, "That's correct." *Id.* at 2104. Although Dr. Hemphill's testimony could be viewed as adopting the state's theory of how Mr. Richie and Mr. Waller strangled Mrs. Launhardt by raising her legs, he did not explain how the physical evidence compelled that conclusion and his opinion was not so definitive as to demand agreement by every rational juror. *See Ryder v. State*, 83 P.3d 856, 868–69 (Okla. Crim. App. 2004) (weight of expert testimony is properly left to the jury).

-19-

In sum, it would be unreasonable to say that a rational juror could not have had a reasonable doubt that Mrs. Launhardt was alive when Mr. Richie and Mr. Waller left the abandoned house.

Alternatively, the state argues that even if Mr. Richie and Mr. Waller left Mrs. Launhardt alive, they did so under conditions showing that they fully intended and expected her to die, so "[t]he evidence presented in this case would not permit a rational juror to find absence of design to effect death." Aplee. 2d Br. on Cross Appeal at 23. It points out that the two men left Mrs. Launhardt concealed in a closet in an unventilated house in the heat of summer, with the closet door shut, in a remote area. Because they left her bound in a way that prevented escape, and because "she could not sit, or stand, forever," Aplee. 4th Br. on Cross Appeal at 10, it reasons that they must have intended that she eventually fall over and strangle to death from the ligature around her neck. The state concludes: "This evidence, combined with the fact that [Mr. Richie] and his co-defendant kidnapped the victim at gunpoint and robbed her of her money . . . undermines any suggestion that this murder was committed without design to effect death." Aplee. 2d Br. on Cross Appeal at 25 (citations omitted). As corroboration of its claim that Mr. Richie expected her to die in the closet, it notes that he did not leave the Muskogee area for New Orleans until August 30 (two days after the kidnapping), and he would have known that remaining near

-20-

the scene of the murder would expose him to a high risk of capture if he really expected Mrs. Launhardt to be able to escape from her bindings.[3]

Although the state's alternative theory of first-degree murder is a plausible one, the state must show more than plausibility to prevail on the lesser-included-offense issue. It must show that no juror could harbor a reasonable doubt that Mr. Richie intended Mrs. Launhardt's death even if he left her alive. It has not made this showing. Mr. Richie's conduct was not wholly inconsistent with his believing that she could escape. He did not remain long in the vicinity of the abduction. After leaving Mrs. Launhardt (dead or alive) in the abandoned house, he went to Muskogee (40 miles from the abduction) and departed the state less than 48 hours later. Much more importantly, a reasonable doubt could arise simply because it would make no sense to leave Mrs. Launhardt alive if he intended for her to die at the house anyway. (There has been no suggestion of any sadistic motive in killing her.) To be sure, the circumstances in which he and Mr. Waller left her did pose a very serious risk of death, but that risk is what would make the crime a depraved-mind murder—death "caused by conduct which was imminently dangerous to another person [and] . . . evinced a depraved mind in extreme disregard of human life." *Taylor*, 998 P.2d at 1231. We note that

---

[3]As Mr. Richie points out, the state never argued to the jury, or in any judicial pleading before this appeal, that he could be guilty of first-degree murder even if Mrs. Launhardt was left alive. But we do not foreclose the state from raising this argument to defend the verdict.

Mr. Richie asserts, without contradiction by the state, that there is no Oklahoma case in which "a properly instructed jury selected a first degree murder verdict in a scenario similar to this one [that is, when the victim was left alive]." Aplt. 3d Br. on Cross Appeal at 15.

We hold that even if we afford AEDPA deference to the OCCA decision on Mr. Richie's appeal, it was unreasonable for the OCCA to decide that the evidence did not support a jury instruction on second-degree depraved-mind murder. The OCCA's affirmance of the denial of the lesser-included instruction was an unreasonable application of the law clearly established by the Supreme Court in *Beck,* 447 U.S. 625.

## C.  Juror Bias

During voir dire all the jurors selected to hear Mr. Richie's case said that they would not hold it against him if he did not testify. After trial, however, Mr. Richie obtained affidavits from one juror and from an investigator relating her interviews of several other jurors. The affidavits indicated that some jurors may have held against Mr. Richie his failure to testify. He used the affidavits to support a claim for postconviction relief. The OCCA rejected the claim. It ruled that consideration of the jurors' statements was barred by Okla. Stat. tit. 12, § 2606(B), which states:

> Upon an inquiry into the validity of a verdict or indictment, a juror
> shall not testify as to any matter or statement occurring during the
> course of the jury's deliberations or as to the effect of anything upon

the juror's mind or another juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes during deliberations. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. An affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying shall not be received for these purposes.

As explained earlier, AEDPA requires us to give deference to the OCCA decision if it denied relief on the merits. The federal district court ruled that the OCCA's decision was not on the merits because it disposed of the issue on state-law grounds without addressing the merits of the federal claim. *Richie*, 563 F. Supp. 2d at 1269. But since then we have held to the contrary in a quite similar case. In *Matthews v. Workman*, 577 F.3d 1175 (10th Cir. 2009), we reviewed the OCCA's rejection of a juror-bias claim based on a juror's testimony in a postverdict evidentiary hearing that she had made up her mind to sentence the defendant to death before the penalty phase of the trial. The OCCA had applied § 2606(B) in refusing to consider the juror's testimony. We held that

> [t]he OCCA's decision qualifies for AEDPA deference as an adjudication on the merits . . . because it was not a procedural ruling in which the court dismissed the claim as improperly before it. Rather, the state court's decision was a substantive determination that the claim was unsupported by any evidence, competent under that state's rules of evidence.

*Id.* at 1182 (brackets and internal quotation marks omitted).

Thus, the question before us is whether the OCCA's decision on the juror-bias issue was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). It was neither.

Mr. Richie's sole criticism of the OCCA decision is that it refused to consider the affidavit evidence of juror bias. But that refusal did not violate any rights of Mr. Richie under clearly established federal law. Our decision in *Matthews* compels that conclusion. As previously noted, *Matthews* reviewed the OCCA's application of § 2606(B) to exclude from evidence a juror's statement about what she had been thinking during the trial. *See* 577 F.3d at 1180–82. We stated, "There is nothing in clearly established Supreme Court law requiring states to take cognizance of evidence excludable under such common evidentiary rules." *Id.* at 1182. We noted that in *Tanner v. United States*, 483 U.S. 107 (1987), the United States Supreme Court had made a similar evidentiary ruling. *See id.* at 1182–83. *Tanner* held that the Constitution did not require the postverdict admission of evidence otherwise barred by Fed. R. of Evid. 606(b), which is nearly identical to § 2606(B). *See Tanner*, 438 U.S. at 116–27 (addressing postverdict juror testimony that members of the jury had ingested drugs and alcohol during the trial).

We accordingly affirm the district court's denial of relief on Mr. Richie's juror-bias claim.

## III.    CONCLUSION

We AFFIRM (1) the district court's grant of Mr. Richie's application for a writ of habeas corpus on his conviction for first-degree murder, subject to the state's right to retry him within a reasonable time; and (2) the district court's denial of his application with respect to his other convictions.